Vernon F. and Vera Harp v. Commissioner.
Harp v. Commissioner
Docket No. 54772.
United States Tax Court
T.C. Memo 1957-105; 1957 Tax Ct. Memo LEXIS 147; 16 T.C.M. (CCH) 431; T.C.M. (RIA) 57105; June 26, 1957
*147 Net worth method. - Deficiencies in income tax determined by use of net w3rth method approved upon failure of the petitioners to show error in the respondent's determinations. Additions to tax for failure to file one return, for failure to file declarations of estimated tax for certain years, and for substantial underestimate of tax, approved. Robert J. Hobby, Esq., for the petitioners. James F. Shea, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax for the years *148 1948 to 1951 and additions thereto as follows: Additions to Tax
Defi-
Sec.
Sec. 294
Sec. 294
Year
ciency
291(a)
(d)(1)(A)
(d)(2)
1948
$8,617.80
$889.07
$533.43
1949
9,464.02
603.11
1950
6,805.56
745.42
447.25
1951
6,170.04
$1,542.51
818.96
491.38
The questions presented are whether the respondent was justified in determining the petitioners' taxable income by the net worth method; if so, whether such computation is correct; and whether he properly determined additions to tax for failure to file a timely return, for failure to file declarations of estimated tax, and for substantial underestimates of estimated tax. Findings of Fact The petitioners are husband and wife and reside at Mansfield, Ohio. They filed joint income tax returns for the years 1948 to 1951, inclusive, with the collector of internal revenue for the 18th district of Ohio at Cleveland, Ohio. The husband, Vernon F. Harp, will be referred to as the "petitioner," and his wife, Vera Harp, will be referred to as his wife, or by name. The petitioner was originally a plasterer by trade. However, for about 30 years he has been engaged in the business *149 of building homes, more extensively since 1938. From 1938 to 1951 he engaged in several development projects. About 1938 he acquired land known as Harpcrest Heights for development. He subdivided the land into 109 lots, constructed houses thereon and eventually sold them. At some undisclosed time subsequent to his first purchase, other land was added to this development. On January 1, 1948 the petitioner had 6 houses under construction in this development, 2 practically completed and the other 4 in varying stages of completion, ranging upward from 60 percent complete. The cost to the petitioner of the complete construction of these houses varied, ranging between $6,500 and $7,000. The amount actually expended prior to January 1, 1948 in the construction of these houses has not been shown. During the period 1948 to 1951, inclusive, the petitioner sold 27 lots - 7 in 1948, 4 in 1949, 10 in 1950, and 6 in 1951. In connection with this development, the petitioner undertook to supply water to the purchasers. One well was dug in 1938 and another in 1942 or 1944. A water rental contract was entered into with each purchaser. The petitioner has been furnishing water to the owners from 1938 *150 to date. In connection with these wells the petitioner in 1944, 1945 and 1946 expended $1,603.11 in well-drilling and installing pumps. In April 1947 the petitioner purchased unimproved land, known as the Punch Bowl land, for $12,000 which had been completely paid for by the end of 1947, $50 by cash, $1,000 by check and $10,950 out of proceeds of a mortgage loan obtained by the petitioner from the Mansfield Building and Loan in the amount of $13,500. Construction of buildings on this property commenced in 1947. The main building was completed in 1947 at a cost of about $10,000. A pavilion was also constructed in that year at a cost of at least $800. Also a three apartment dwelling was completed or substantially completed in 1947 and it was occupied by the first tenant on January 1, 1948. Later-constructed improvements on this property included a filling station, barber shop and additional apartments. In 1947 the petitioner also purchased a tract of land known as Fritz Fair for $1,500. The petitioner's wife has always kept the records of the petitioner's construction business. She kept a single-entry journal containing cash receipts and disbursements, and a property ledger, which *151 contained entries of real estate owned and also water rents received. This constituted a singleentry system maintained on the cash basis. In the latter part of 1948 she engaged an accountant to whom she sent monthly sheets showing receipts and expenditures. He then kept a ledger in which he entered the income, purchases and expenses. He furnished income statements to the petitioners every three months. He computed the payroll taxes and prepared the income tax returns of the petitioners for all the years in issue, 1948 to 1951. For the years 1943 to 1947 the petitioner failed to file timely returns. In 1948 he and his wife contacted a deputy collector, now deceased, who was a personal friend of theirs, to help "get it straightened up." He had previously helped the petitioner and his wife prepare the tax return for 1939 or 1940. Vera Harp furnished him information from the books to be used by him to prepare delinquent tax returns for the years 1943 to 1947. He made computations of the petitioner's taxable income by the net worth method, and the returns for those years were filed on that basis in 1948. The deputy collector used a net worth of $37,500 as of January 1, 1943 and a net *152 worth of $75,000 as of December 31, 1947. He added to increases in net worth for each year certain amounts on account of living expenses and calculated net income of $4,560 for 1943; $7,060 for 1944; $8,080 for 1945; $8,145 for 1946; and $20,188 for 1947, and the tax computed on that basis, as well as interest and additions for delinquency, were paid. The record contains no detail of the items making up the net worth at January 1, 1943 and December 31, 1947 or any other details of the computation. The petitioners' income tax returns for 1948 to 1950 were examined by a revenue agent in the petitioner's office in 1951. He spent several days in making the examination. At that time he examined all the bank statements and the available records which consisted of all the books and records, except such of the current records as were in the accountant's office. The monthly sheets which had been sent to the accountant had been retained by him and were not available in the petitioner's office. At some later date he included the year 1951 in his examination. Thereafter, the accountant conferred with the revenue agent in the latter's office with regard to the audit for the years 1948 to 1951. *153 The tax liability of the petitioners for the years 1948 to 1951 was the subject of several conferences at the conferee level and at the appellate level at the office of the Internal Revenue Service. The petitioners engaged a certified public accountant to do some work in connection with the examination of the petitioners tax liability for the years 1948 to 1951. He prepared a report in August 1953 and furnished the respondent's representatives with a copy thereof about August 6, 1953, which was prior to the issuance, on June 21, 1954, of the notice of deficiency for the years in question. Such report contained a proposed revision of the net worth at January 1, 1948 and December 31, 1951 as determined by the respondent. At the time of furnishing such report the case had been investigated by the respondent and had been referred back from the appellate level to the conferee level and the certified public accountant had a conference with the revenue agent about it. At a conference on July 31, 1953 with the respondent's conferee the certified public accountant apprised him of the petitioners' contention that the net worth of January 1, 1948 should be at least $75,000. In addition to *154 income from the construction business, which included the sale of improved lots, the petitioner's income for the years 1948 to 1951 included income from the plastering business, from rental, and from a grocery store, restaurant and bar. At one time he also sold two unimproved lots but purchased them back. The amounts of net income shown by the petitioners in their returns for the years 1948 to 1951, inclusive, and the amounts of net income for those years determined by the respondent, in each case after allowance of the standard deduction, are as follows: Amount Deter-
Amount on
mined by the
Year
Returns
Respondent
1948
$ 7,339.50
$35,199.25
1949
7,735.55
37,524.02
1950
9,069.92
30,817.08
1951
10,939.42
28,678.34
The respondent computed the petitioners' taxable income for such years by the net worth plus personal and other nondeductible expenditures method. The reason that the respondent resorted to the net worth method is stated by him in the notice of deficiency, as follows: "The records kept by you are not a full, complete and adequate record of all your business transactions, and do not fairly reflect your net income, as required *155 by sections 22, 41 and 54 of the Internal Revenue Code and the Commissioner's regulations thereunder." His computation is as follows: 1-1-48
12-31-48
12-31-49
12-31-50
12-31-51
Assets: Cash - Mansfield Saving & Tr.
$ 776.89
$ 7,756.86
$ 268.26
$ 545.00
$ 223.97
Personal c/a - Mans. Sav. & Tr.
105.70
Punch Bowl - Inventory
2,415.67
Equipment
3,929.26
6,058.27
Moore Property: 4-apt. Dwelling
6,350.00
6,350.00
6,350.00
6,350.00
6,350.00
3-garage apts.
6,000.00
6,000.00
6,000.00
6,000.00
6,000.00
1 Stucco House
3,200.00
3,200.00
3,200.00
3,200.00
3,200.00
1 Frame
1,700.00
1,700.00
1,700.00
1,700.00
1,700.00
Lot. No. 17 H. C. Frame
3,500.00
3,500.00
3,500.00
3,500.00
3,500.00
Residence
10,000.00
10,000.00
10,000.00
10,000.00
10,000.00
Storage Whse.
6,200.00
6,200.00
6,200.00
6,000.00
6,000.00
25-acre Farm - Ashland, Ohio
5,254.52
5,254.52
5,454.52
5,454.52
5,454.52
Punch Bowl Property: Commercial Bldg.
10,250.00
20,250.00
31,750.00
31,750.00
31,750.00
3-apt. Dwelling
7,000.00
7,000.00
7,000.00
7,000.00
Apt. & 11 Acres
9,000.00
9,000.00
9,000.00
9,000.00
4,000.00
3-Room Frame
2,000.00
2,000.00
2,000.00
2,000.00
2,000.00
3-Room Frame
1,000.00
1,000.00
1,000.00
1,000.00
1,000.00
2-Apt. Dwelling
2,000.00
2,000.00
2,000.00
Mobile Gas Station
9,000.00
9,000.00
Barber Shop
1,200.00
1,200.00
Inventories: Houses in Process
14,658.13
55,340.59
61,500.00
53,500.00
71,500.00
29 H. C. Hts. Lots
10,000.00
10,000.00
10,000.00
10,000.00
10,000.00
Bldg. Materials & Supplies
2,123.26
2,281.37
3,989.00
4,357.85
4,205.12
Water System
9,500.00
9,500.00
9,500.00
9,500.00
Bird Tract
2,700.00
2,700.00
2,700.00
2,700.00
Equipment & Tools
4,803.67
6,722.37
8,572.37
9,989.15
9,239.15
Accounts Receivable
6,691.00
632.63
1,125.05
3,789.97
2,309.83
Notes Receivable
2,575.00
2,396.30
1,743.07
1,530.18
5,118.73
Mtges. Receivable
9,211.42
8,036.24
18,350.27
25,427.22
23,017.06
Land Contracts - Church of God &
T. Miner
9,200.00
Truax Place
7,500.00
7,500.00
7,500.00
7,500.00
Total Assets
$128,423.15
$187,281.10
$220,402.54
$234,193.89
$245,774.08
Liabilities: Accounts Payable
12,539.64
28,176.67
26,916.03
28,907.88
23,636.00
Mtges. Payable - Mans. Sav. & Tr.
35,000.00
14,110.00
20,000.00
6,133.35
6,133.35
Notes Payable - Mans. Sav. & Tr.
6,000.00
9,766.65
Mtges. Payable - Mans. Bldg. & Loan
48,300.00
77,275.00
82,850.00
68,600.00
68,600.00
Chattel Mtges. - Mans. Sav. & Tr.
788.00
1,862.00
112.00
Reserve for Depreciation
3,489.32
7,419.55
11,914.19
14,511.87
19,025.48
Total Liabilities
$ 99,328.96
$133,769.22
$141,680.22
$129,781.75
$117,506.83
Net Worth
$ 29,094.19
$ 53,511.88
$ 78,722.32
$104,412.14
$128,267.25
Increase in Net Worth
24,417.69
25,210.44
25,689.82
23,855.11
Taxes paid
6,781.56
8,313.58
1,127.26
823.23
Living Expenses
5,000.00
5,000.00
5,000.00
5,000.00
Adjusted Gross Income
$ 36,199.25
$ 38,524.02
$ 31,817.08
$ 29,678.34
*156 Declarations of estimated tax were not filed by the petitioners for the years 1948 and 1950. The record does not disclose whether a declaration of estimated tax was filed for 1951. The income tax return of the petitioners for the year 1951 was not filed until September 24, 1952. The petitioners' accountant had timely prepared a return for 1951 but it was not timely filed. When the return was filed there was attached to it an affidavit of Mrs. Vernon Harp, dated September 11, 1952, stating that the true reasons for failure to file on or before March 15, 1952, were: "At this time an examination was being made of income tax reports for several previous years and it was my understanding that before the 1951 report was filed the depreciation on the various buildings was to be established as this year was being included in the examination. I have been holding the record for that reason and with no intention to delay the filing. The Spreng Accounting Service at Loudonville, Ohio delivered this report to me in the latter part of February 1952 and I misunderstood their instructions. I respectfully request that there be no penalty assessed for the above reasons." Opinion In determining *157 the deficiencies involved herein the respondent employed the net worth method on the ground that the records kept by the petitioners did not constitute a full, complete and adequate record of all their business transactions and did not fairly reflect their income. The respondent's determinations of tax liabilities are prima facie correct and the burden of proof of showing error therein is upon the petitioners. Thomas v. Commissioner (C.A. 6, 1955), 223 Fed. (2d) 83; Carmack v. Commissioner (C.A. 5), 183 Fed. (2d) 1; Joseph V. Moriarty, 18 T.C. 327, affd. per curiam (C.A.D.C.), 208 Fed. (2d) 43; Rule 32 of the Rules of Practice of this Court. See also Hoefle v. Commissioner (C.A. 6), 114 Fed. (2d) 713. In the Carmack case the court stated in part: "If the increase in taxpayer's net worth during the tax year involved was not actually attributable to unreported income, it was incumbent upon him to establish that fact by some competent and satisfactory evidence. This he has signally failed to do. Cf. Harris v. Commissioner, 4 Cir., 174 Fed. (2d) 70, 72; Hoefle v. Commissioner, 6 Cir., 114 Fed. (2d) 713, 714. *158 " The petitioners contend that the use of the net worth method is not proper where the books and records are adequate. On brief, they state that at the hearing of this case the books and records were in the court room, that the respondent did not question the accuracy of the books by cross-examination and that he did not put on the stand any witnesses to question the accuracy of the books and records. We think it obvious that there was no burden upon him to do so. Since he held that the books were inadequate, the burden was on the petitioners to show the contrary. This they have failed to do. The books were not put in evidence nor was there any evidence that they are complete and adequate to reflect income from all the business activities. See David Courtney, 28 T.C. No. 71 (June 14, 1957). It is well established that the net worth method may be used even though a taxpayer maintains a set of books, that such method may be used to test the accuracy of the books and returns and, when properly employed, may show that the books are not trustworthy. Holland v. U.S., 348 U.S. 121; Thomas v. Commissioner, supra; Morris Lipsitz, 21 T.C. 917, *159 affd. (C.A. 4), 220 Fed. (2d) 871, cert. denied 350 U.S. 845; Frank Imburgia, 22 T.C. 1002; Harry Gleis, 24 T.C. 941, affd. (C.A. 6), - Fed. (2d) - (February 19, 1957); Abraham Galant, 26 T.C. 354. See also Lias v. Commissioner (C.A. 4), 235 Fed. (2d) 879, affirming 24 T.C. 280. Since the petitioners have failed to show that their books and returns accurately reflect their taxable income, we are forced to conclude that they have not shown error in the respondent's resort to the net worth method in determining taxable income for the years in question herein. The petitioners also state that under the Holland case, the determination of the opening net worth with reasonable accuracy is essential and that to this end the respondent is required to follow up leads furnished by the taxpayer. It is their position that they did furnish the respondent certain leads, that he failed to pursue them, and that consequently his deficiency determinations are so arbitrary and capricious as to render them of no effect; and that it was not incumbent upon them to prove that they owed no tax, or what was the tax *160 that they did owe, citing among other authorities Helvering v. Taylor, 293 U.S. 507, and Thomas v. Commissioner, supra. The petitioners introduced in evidence a report of a certified public accountant in which there is set forth a proposed revision of the net worth at January 1, 1948 and at December 31, 1951 as determined by the respondent. It is their contention that the furnishing of such report to the respondent prior to the mailing of the notice of deficiency constituted the furnishing of leads as to assets owned by the petitioners at the crucial dates and that it was these leads which the respondent ignored. The petitioners have not shown that the respondent failed to give proper consideration to the information contained in such report. For all that the record shows he may have made a complete investigation of all matters contained in the report. The accountant's report was received in evidence for the limited purpose of showing that such report was prepared and furnished to the respondent and as a basis for the petitioners' contention that they furnished the respondent certain leads. It was not, and could not, be received in evidence for the purpose *161 of proof of any information contained therein. In addition to their contention that the respondent ignored leads furnished by them, the petitioners have also submitted some evidence as to some of the items listed in the respondent's net worth computation, all with a view to showing arbitrary action on the part of the respondent. However, the evidence is meager and fragmentary, and after considering the whole record we think there is no basis whatever for the view that the respondent, in determining the deficiencies, acted in an arbitrary or capricious manner. Of course, if the evidence adduced by the petitioners is sufficient to show error in any respect in the respondent's determination, proper correction should be made in the respondent's computation. Thomas v. Commissioner, supra. With this in mind, we have carefully considered the evidence presented, but have arrived at the conclusion that such evidence is not sufficient to meet the petitioners' burden of overcoming the presumption in favor of the correctness of the respondent's determination in any respect. The several items in the net worth computation to which the parties have directed specific attention will *162 be discussed in some detail. The petitioners contend that in determining the net worth figure of $29,094.19 for January 1, 1948, the respondent ignored the net worth figure of $75,000 which had been used by the deputy collector as the petitioner's net worth at December 31, 1947 and upon the basis of which the tax for such prior year had been computed and paid. It is argued that the Government, in accepting tax based upon this net worth figure, is estopped from using a net worth figure of less than $75,000 at January 1, 1948. The circumstances under which the tax liability for the years 1943, 1944, 1945, 1946 and 1947 was computed and returns filed are described in our findings of fact. The petitioner was delinquent in filing returns for those years and in 1948 he called upon a deputy collector, whom he knew and who had assisted him before, to help him in preparing returns for the delinquent years. The deputy collector is now dead and there is no evidence that he made an official examination or audit, or that he was acting other than in an advisory capacity. We are not informed as to the extent of his consideration of the matter or as to any details of his computation. The petitioners *163 did not show the items which entered into the calculation of the net worth of $75,000. All we know is that the petitioner Vera Harp furnished the deputy collector information from the books. There is no evidence of the correctness of the information furnished or of the items included in the calculation. We know of no authority which would justify or permit a holding of estoppel against the Government in this situation. Obviously, there is no estoppel where, as here, there is no showing that there has been any determination at all by the respondent as to the correctness of the net worth, or the figures that went into it, for a prior year. The two cases cited by the petitioners, United States v. Brown (C.A. 6), 86 Fed. (2d) 798, and C. D. Johnson Lumber Corporation, 16 T.C. 1406, have no bearing upon the question so far as we can see. In his net worth computation the respondent did not include in the list of assets on hand at January 1, 1948 an item of $12,000 which the evidence shows the petitioners had paid in 1947 for land constituting a part of the Punch Bowl property. The respondent's computation, however, does include at January 1, 1948 an item "Apt. *164 and 11 Acres" at $9,000. The details of the respondent's computation show that this includes $7,000 for the building itself and $2,000 for the land. The petitioners presented no evidence in explanation of this $9,000 item. Since, however, it is included under the general heading of "Punch Bowl Property" we think we must assume, for present purposes, that the $2,000 represents a part of the cost of the Punch Bowl land. At least the petitioners have not shown the contrary. There remains $10,000 of the cost of the Punch Bowl land which has not been included by the respondent. However, the inclusion of such amount at the beginning and end of each year would not affect the computation of increase in net worth for any year. The evidence discloses that the "3-apt. Dwelling" which the respondent included in closing net worth at December 31, 1948 at a cost of $7,000 was actually completed before January 1, 1948 and that a tenant moved into one of the apartments on January 1, 1948. The respondent contends, however, that his net worth computation should not be altered to include any amount on account of this apartment at January 1, 1948 because the petitioners have failed to show when the cost *165 thereof was incurred or when actual disbursement was made to pay such cost. We agree with the respondent. Under the net worth method of computing taxable income it is necessary to know the net outlay made by the taxpayer for assets on hand at a particular time. It is necessary not only to show the correct cost but any offsetting liability existing against such asset. This is usually done in a net worth computation by listing the property among the assets at contract cost and including among the liabilities any obligation existing against the property. Here, the petitioners have not shown when they paid for this asset or the manner of payment - that is, whether with borrowed money giving rise to a liability offsetting in whole or in part the cost included among the assets. It is true that the respondent's net worth computation shows among the liabilities at January 1, 1948 large amounts of mortgages and accounts payable, but there is no evidence whatever as to whether those liabilities relate to the item in question. The petitioners must have had full knowledge upon this fundamental aspect of their operations and presumably could readily have shown any error in this respect. Since they *166 did not do so, adjustment of the net worth computation on account of the three apartment dwelling is not justified. The evidence also discloses that there was constructed on the Punch Bowl property in 1947, in addition to the main building, a pavilion a a cost of at least $800. Whether the respondent's computation purports to include the cost of this pavilion is not clear, but in any event the inclusion of this item at the beginning and end of each year would not affect the computation of increase in net worth for any year. In his net worth computation the respondent has included in inventory of houses in process at January 1, 1948 an amount of $14,685.13. The evidence shows that as of that date there were 6 houses in process, 2 practically complete and the other 4 ranging upward from 60 percent complete. There is also evidence to show the cost of such houses in their finished state and it would be possible to fix a reasonably accurate cost of the houses at January 1, 1948 in their unfinished state. However, here, as in the case of the three-apartment dwelling, the petitioners have not furnished us with evidence of the facts surrounding the construction of the houses, the time *167 of payment, and the net outlay therefor as of January 1, 1948. For the reasons stated hereinabove with regard to the three-apartment dwelling, we are of the opinion that we would not be justified in disturbing the respondent's determination. In connection with his development of Harpcrest Heights and the sale of improved lots thereon the petitioner sunk wells and undertook to furnish water to the home owners. The evidence shows that in 1944, 1945 and 1946 he expended $1,603.11 in well-drilling and installing pumps. The respondent did not include in the petitioners' net worth at January 1, 1948 any amount on account of this water system. He did include in net worth at December 31, 1948 an amount of $9,500 as cost of the water system. As we understand the petitioners' argument, it is contended that the water system was built before January 1, 1948 and that the $9,500 should have been included in the net worth statement as of January 1, 1948. However, there is no evidence to show error in the respondent's determination that $9,500 was spent on the water system in 1948. In fact, the depreciation schedule attached to the income tax return filed by the petitioners for the year 1949 shows *168 an expenditure in 1948 of $9,500. The schedule is confusing in that it is stated therein that depreciation had previously been taken for two years. An examination of the petitioners' return for 1948 discloses that no depreciation was taken on a water system in that year. In this confused state of the record, we do not feel justified in including in opening net worth at January 1, 1948 the amount of $9,500. If an amount of $1,603.11 were included in net worth it would also have to be added to the amount included by the respondent as of December 31, 1948 and also at the close of each of the years under review, since the water system continued in existence. This, of course, would result in no effect upon the increase in net worth for any of the years. In his net worth statement the respondent included at the beginning and end of each of the years in controversy an item of $10,000 as cost of 29 Harpcrest Heights lots. The evidence shows that the petitioner sold, out of the Harpcrest Heights development, 7 lots in 1948, 4 in 1949, 10 in 1950, and 6 in 1951, and the petitioners argue that the respondent was in error in not making adjustment in opening and closing net worth for the various *169 years on account of these sales. Alternatively, the petitioners contend that if the effect of the respondent's determination is that there were 29 lots on hand at the end of 1951, then he has erred in not giving effect to the proof that prior to that time there were on hand 27 lots which had been sold throughout the period of years under consideration. Under this reasoning the petitioners would have us conclude that there were 29 plus 27 lots on hand at January 1, 1948 and that a correction of cost of lots on hand at January 1, 1948 should be made. The petitioners would have us indulge in speculation as to the number and cost of lots on hand. There can be no question that they could have established the facts since Vera Harp testified that year-end inventories were taken of lots on hand and houses under construction. No claim is made that such records were not available. Since the petitioners have failed to show how many lots they had on hand at any particular time or the cost thereof, they have failed to establish facts which would warrant our changing the respondent's determination. It has been shown that the petitioner purchased property known as the Fritz Fair tract in 1947 at *170 a cost of $1,500, which the respondent did not include in net worth at January 1, 1948. There is no evidence to show that the petitioner disposed of this property and the same amount would necessarily be included in net worth at the beginning and end of each year in controversy. This, of course, would have no effect upon the increase in net worth for any of the years. For the year 1951 the petitioners failed to file a timely income tax return and the respondent determined additions to tax on account thereof under section 291(a) of the Internal Revenue Code of 1939. That section provides that in such a case a percentage of the tax shall be added, graduated to a maximum of 25 percent, "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." It has been held that whether there is reasonable cause for failure to file a timely return is a question of fact in respect of which the burden is on the petitioner. In Lee v. Commissioner (C.A. 5), 227 Fed. (2d) 181, it was stated: "There remains for determination only the small penalty liability assessed for failure to timely file the 1947 return. While we agree with the taxpayers that *171 there is no affirmative evidence that the delayed filing was deliberate, this will not avail them as a defense as this is not the language of the statute. It, on the contrary, provides that the penalty is to be assessed unless reasonable cause for not filing is shown, and it has been held repeatedly that whether there is reasonable cause for failure to file a timely return is a question of fact in respect to which the burden is on the petitioner and that its solution is peculiarly within the province of the Tax Court. Plunkett v. Commissioner, 1 Cir., 118 Fed. (2d) 644; Burford Oil Co. v. Commissioner, 5 Cir., 153 Fed. (2d) 745; Commissioner of Internal Revenue v. Lane-Wells Co., 321 U.S. 219, 64 S. Ct. 511, 88 L. Ed. 684; Southeastern Finance Co. v. Commissioner, 5 Cir., 153 Fed. (2d) 205. " In her affidavit attached to the delinquent return for 1951 the petitioner Vera Harp stated that failure to timely file the return was due to her misunderstanding of the instructions of her accountant who had prepared and delivered a return for 1951 to her in February 1952. However, at the trial and on brief no mention is made of this reason *172 for failure to file on time. Rather, the petitioner Vera Harp testified that the reason for failure to file was because the revenue agent had told them not to file a return because he would "pick it up in his audit." We consider it most unusual that, if that were the real reason for failure to file, mention was not made of the fact in the affidavit filed with the delinquent return. Under the circumstances we are not satisfied as to what prompted the petitioners to delay the filing, and we are forced to the conclusion that the petitioners have failed to establish a reasonable cause for the delinquency in filing. The respondent's addition to the tax on account of the failure to timely file is approved. The evidence shows that the petitioners failed to file a declaration of estimated tax for 1948 and 1950. The respondent has also held that they failed to file a declaration for the year 1951. There is no evidence to show that they did file one for 1951. The respondent determined additions to the tax under section 294(d)(1)(A) on account thereof for each of these years. That section provides for an addition to the tax unless the failure to timely file is due to reasonable cause and *173 not to willful neglect. The petitioner testified that the declarations for 1948 and 1950 had been prepared but were not filed because he had been in an accident and was hospitalized and that later his wife was in the hospital. There is no evidence directed toward any reason for failure to file for 1951. There is no evidence as to the time or duration of the illness of either of the petitioners or as to why the declarations never were filed. The petitioner Vera Harp referred to the illnesses but appeared to relate them to the failure to file returns for the years 1943 to 1947. On brief, the illnesses of the petitioners is not referred to as a reason for the failure to file. Instead, an argument is made to the effect that there was some withholding of tax on the amount withdrawn by the petitioner from the construction business and that the failure to file declarations for 1948, 1950 and 1951 was due to the petitioners' belief that their custom of withholding income tax on their withdrawals in the business excused them from filing such a declaration. There was no testimony whatsoever by either of the petitioners to the effect that the reason for failure to file was based upon the belief *174 that withholding released them from the duty of filing. In this confused state of the record we are compelled to the conclusion that the petitioners have not established a reasonable cause for the failure to file the declarations of estimated tax for the years 1948, 1950 and 1951, and we sustain the respondent's determination of the additions to the tax under section 294(d)(1)(A). The respondent also has determined additions to the tax under section 294(d)(2) on account of substantial underestimate of tax for the years 1948, 1949, 1950 and 1951. The statute does not provide for any extenuating circumstances which would afford relief against imposition of this addition to the tax. H. R. Smith, 20 T.C. 663. Where no declaration has been filed, as is the situation here for the years 1948, 1950 and 1951, we have held that the effect of failure to file is equivalent to substantially underestimating the tax and the amount of the estimated tax is to be considered as zero for the purpose of computing the amount of the additions to the tax. G. E. Fuller, 20 T.C. 308 (affd. on other issues (C.A. 10), 213 Fed. (2d) 102); Harry Hartley, 23 T.C. 353 *175 and 23 T.C. 564. The only indication we have of the amount which the petitioners estimated as tax for 1949 is contained in an exhibit attached to the respondent's net worth computation showing payment in 1949 of $100 of estimated tax. On the basis of the net income for that year as determined by the respondent the petitioners did substantially underestimate the tax. We therefore hold that the petitioners are liable for the additions to the tax for substantial underestimate of tax for all the years 1948 to 1951. Decision will be entered for the respondent.